**AMERICAN RICE, INC.,**
**Plaintiff-Appellee,**

v.

**The ARKANSAS RICE GROWERS CO-OPERATIVE ASSOCIATION, d/b/a Riceland Foods, Defendant-Appellant.**

No. 82–2146.

United States Court of Appeals,
Fifth Circuit.

March 28, 1983.

**410**

George D. Martin, Galveston, Tex., James L. Kurtz, Washington, D.C., for defendant-appellant.

Paul L. DeVerter, II, and Larry Currell Jones, Houston, Tex., for plaintiff-appellee.

Before WISDOM, REAVLEY and TATE, Circuit Judges.

WISDOM, Circuit Judge:

In this interesting and unusual trademark dispute, we are asked to explore the extraterritorial reach of the Lanham Act, 15 U.S.C. § 1051 *et seq.* The district court, 532 F.Supp. 1376 (1982), concluded that it was not powerless to prevent the acts complained of, despite the facts that the sales of the products bearing the allegedly infringing marks were consummated in a for- eign country, Saudi Arabia, and none of those products found their way back into the United States. Finding also that there was a likelihood of confusion between the competing products, the district court issued a preliminary injunction, enjoining the defendant from any acts likely to cause confusion in the Saudi Arabian consuming public.[1] We affirm.

I.

The plaintiff, American Rice, Inc. ("ARI"), and defendant, Arkansas Rice Growers Cooperative Association ("Riceland"), in this trademark suit are farmers' marketing cooperatives that process, mill, package, and market rice for their member-patrons. ARI is based in Houston, Texas, and counts among its members 1700 farmers in Arkansas, Louisiana, and Texas. Riceland's 14,000 members are located in Arkansas, Louisiana, Mississippi, and Missouri. Both cooperatives are actively engaged in selling rice under a number of brands in the United States and abroad. During the fiscal year ending July 31, 1981, ARI's sales in Saudi Arabia totalled over $100 million, giving it the lion's share or roughly 73 percent of that country's market. Riceland's performance in Saudi Arabia has been more modest, although it is the largest producer of rice in the United States. The company reported no sales in the years 1979 and 1980, approximately $5 million between 1980–1981, and $5.8 million in fiscal year 1981–1982 through the date of the district court's hearing.

In 1975, ARI purchased Blue Ribbon Mills, a company that had been exporting its rice to Saudi Arabia since 1966, and was assigned that company's trademarks. Included among those trademarks were the word marks "Blue Ribbon", "Chopstick", and "Abu Bint", and the design mark of a girl. Since the takeover of Blue Ribbon, ARI has continued to market rice under these marks with the assistance of its brokerage firm, Alpha Trading and Shipping Agencies, Ltd. ("Alpha"). Alpha is ARI's exclusive agent in Saudi Arabia, and is li-

---

1. For the prohibitory language of the injunc- tion, see footnote 5.

censed by ARI to use the mark "Abu Bint" and to assist it in the on-going efforts to obtain a trademark registration in that country. ARI has attempted to register the "Abu Bint" mark since 1972, when a Saudi official rejected the application.

At the time of the injunctive order, ARI owned two federal registrations for the girl design trademark, and Texas trademark registrations, in both English and Arabic, of the word mark "Abu Bint". The plaintiff contends, and the trial court found, that "Abu Bint" translates into English as "of the girl" or "girl brand".[2] The girl design marks, which are featured prominently on ARI's rice bags sold in Saudi Arabia, show the head and torso of a young oriental woman holding a bowl of rice and chopsticks. The color combination is red, yellow, and black. The words "chopstick" and "rice" appear in large, oriental-style writing, and the words "golden parboiled" are set into the table of the girl design. "Abu Bint" is printed at the top of each bag in Arabic script, and the logo and full name of ARI appear at the bottom in smaller English print.

ARI's rice is referred to only as Abu Bint in Saudi Arabia, and not as Chopstick brand. The reason for this, as the district court stated, is that the largely illiterate Saudi Arabian public distinguishes rice brands on the basis of the design on the package. The high incidence of illiteracy also explains why the plaintiff does not advertise, but relies instead on promotional schemes. ARI sells its rice in merchant "offices" where Saudis are permitted to view samples and place their orders. The rice is typically purchased in large quantities, 25 or 100 pound burlap bags.

Like ARI, Riceland sells its rice in 25 and 100 pound burlap bags through a system of merchants. The defendant initially marketed the rice in bags displaying a lion design, but in 1974 the company entered into an agreement with a Saudi merchant and began selling its product under the name "Abu Binten" or "Twin Girl". The colors appearing on the Twin Girl bags are red, yellow and black, the same colors used by ARI.[3] Four years later, in 1978, Riceland introduced a third brand called "Bint-al-Arab" or "daughter of the Arabs". Although the mark Bint al-Arab is owned by a Saudi merchant, Alamoudi, Riceland contends that it possesses the exclusive right to use the mark outside of Saudi Arabia.[4] The Bint al-Arab design portrays a young Arab woman outlined by a black seal. Arabic script is on the top of the seal and Roman lettering is on the bottom. The predominant colors are green, yellow, and black. Below the seal are the English words "extra long grain, parboiled American RICE," and at the bottom of the bag is the Riceland logo. In 1981, at the request of Alamoudi, Riceland modified its Bint al-Arab label and changed the color scheme to red, yellow, and black. The seal was also enlarged and the girl's facial features were altered.

Following the change in the Bint al-Arab label, Riceland began packaging, on a "private label" basis, another variety of rice called "Gulf Girl" in Arabic. The brand once again featured a label with a design of a girl and the colors red, yellow, and black. The girl is portrayed between black Arabic script, from the waist up, her hair uncovered. Unlike the young woman displayed on the Bint al-Arab rice bags, the Gulf Girl is western in appearance.

---

**2.** Riceland contends that the correct translation of "Abu Bint" is "father of a girl" or "father of a daughter". "Abu", it maintains, means "father's". The district court found that "Abu" can have many meanings, and in the context of product labeling usually means "of the" or "brand". We are unable to conclude that this finding is clearly erroneous. Testimony at the hearing demonstrated that other brands of rice marketed in Saudi Arabia similarly used "Abu", for example, Abu Gamel, or camel brand.

**3.** Riceland has obtained a registration for its Twin Girl mark in the United States, and the district court did not find that use of this mark constituted an infringement.

**4.** Riceland attempted to register the Bint al-Arab mark for use on rice by filing a trademark application in the United States Patent and Trademark Office in November 1978. ARI opposed the application, and the opposition proceeding was stayed pending the outcome of this litigation.

Even before the Gulf Girl mark was introduced, evidence admitted at the hearing showed that Saudi Arabian merchants, longshoremen, and consumers occasionally confused the defendant's Bint al-Arab brand with the plaintiff's Abu Bint rice. Riceland bags were shipped to and accidentally mixed with ARI bags at a merchant's warehouse. And one witness testified that he heard the owner of the Bint al-Arab mark, Alamoudi, attempt to tell a customer looking for Abu Bint that Bint al-Arab was the same rice.

ARI filed suit against Riceland on October 15, 1981, alleging trademark infringement in violation of the common law and the Lanham Act, 15 U.S.C. § 1051 *et seq.,* false designations of origin in violation of 15 U.S.C. § 1125(a), and deceptive trade practices in violation of the Texas Deceptive Trade Practice Act, Tex.Bus. & Com. Code Ann. §§ 17.41–.63 (Vernon Supp. 1980–81). ARI's complaint sought preliminary and permanent injunctive relief, loss of profits, damages, and costs. An evidentiary hearing on the plaintiff's motion for a preliminary injunction was held on February 5, 1982, and on March 2 the motion was granted, enjoining the defendant from the use of certain trademarks and trade dress in connection with the sale of rice in Saudi Arabia.[5] The district court concluded its memorandum opinion and order by finding:

> that plaintiff has presented evidence demonstrating its substantial likelihood of success at trial on the merits. Likelihood of confusion is due to the introduction of the red, yellow and black Bint al-Arab and the Gulf Girl labels. Defendant packages and sells the same product, rice, as plaintiff does. They both reach the same market. They both use the same advertising approach, although plaintiff has introduced a signifi-

cant number of promotional items. There is some evidence of defendant's intent. There is some evidence of actual confusion. The designs of all three labels have similar characteristics. In light of the consuming public, careful distinction between the brands of a common product probably would not be expected. Thus, plaintiff has carried its burden on this element in regard to these two labels.

532 F.Supp. at 1388. The district court also enjoined the defendant from using its green Bint al-Arab label because it, too, was similar to the plaintiff's Abu Bint mark, and its continued use would permit Riceland to retain part of the goodwill misappropriated from ARI.

On appeal, Riceland contends that the district court erred as a matter of law in finding that it had jurisdiction to issue an injunction under the Lanham Act, and in holding that the doctrine of forum non conveniens was inapplicable. It also argues that the district court applied an improper legal standard in determining that ARI had a substantial likelihood of success on the merits, and that its fact findings are clearly erroneous. The district judge's decision is well-researched, carefully reasoned, and correctly sets forth the applicable law. 532 F.Supp. 1376 (1982). We adopt the opinion as our own and affirm the judgment as to each issue considered in the decision. We write only to clarify the related issues of the extraterritorial reach of the Lanham Act and the applicability of the doctrine of forum non conveniens to the facts of this case.

## II.

The Lanham Act provides a trademark registrant a civil right of action against "[a]ny person who shall . . . use in com-

---

**5.** The district court's order prohibited Richland from

> using, directly or indirectly, in any manner, in connection with its rice sales, packaging, exportation and promotion, a single girl design trademark, single girl tradename, and the red-yellow-black trade dress in conjunction with the single girl design trademark, or any other colorable imitation or simulation of the

Abu Bint trademark and dress, which limitation or simulation may amount to an act of unfair competition, and thus, may cause confusion in the Saudi Arabian consuming public such that the public may erroneously believe or assume Riceland's business or rice is related to or sponsored by ARI's business on rice. 532 F.Supp. at 1391.

merce" a colorable imitation of a registered mark in connection with the sale, offering for sale, or distribution of goods. 15 U.S.C. § 1114(1)(a). "Commerce" is sweepingly defined as "all commerce which may lawfully be regulated by Congress." *Id.* § 1127. Section 1121 provides the federal courts with subject matter jurisdiction over causes of action arising under the Act.

The extraterritorial reach of American law is no new subject to federal courts. It has been examined extensively in the context of the Sherman Act, 15 U.S.C. §§ 1 & 2, and courts have proposed a variety of tests for determining when district courts should entertain claims involving extraterritorial conduct. *See Timberlane Lumber Co. v. Bank of America,* 9 Cir.1976, 549 F.2d 597; *Mannington Mills, Inc. v. Congoleum Corp.,* 3 Cir.1979, 595 F.2d 1287; *In re Uranium Antitrust Litigation,* 7 Cir.1980, 617 F.2d 1248.[6] Although cases brought under the Lanham Act have been fewer than those under the Sherman Act, we are not without guidance in determining when a federal court has jurisdiction to entertain an infringement action involving commerce between the United States and a foreign market. The leading case is *Steele v. Bulova Watch Co.,* 1952, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252. Steele, an American citizen, was the owner of the trademark "Bulova" in Mexico. The parts for his watches were manufactured in the United States and Switzerland, but the products were assembled and sold only in Mexico. The plaintiff, Bulova Watch Co., manufactured, advertised, and sold watches in both domestic and foreign markets, using a trademark registered in the United States. American tourists bought the spurious watches and brought them across the border, only to discover later that they were imitations. By the time the case reached the Supreme Court the plaintiff had been successful in its attempt to cancel Steele's Mexican trademark. In deciding that the district court had jurisdiction under the Lanham Act, the Court held that Congress could constitutionally regulate the foreign activities of American citizens, that the Lanham Act revealed a congressional intent to exercise its power to the fullest, and that Steele's foreign activities harmed Bulova's "trade reputation in markets cultivated by advertising here as well as abroad." 344 U.S. at 285–87, 73 S.Ct. at 252–56, 97 L.Ed. at 324–26.

*Bulova* stands for the proposition that "a United States district court has jurisdiction to award relief to an American corporation against acts of trademark infringement and unfair competition consummated in a foreign country by a citizen and resident of the United States." 344 U.S. at 281, 73 S.Ct. at 253, 97 L.Ed. at 322. Because Steele's Mexican trademark was cancelled before the case was decided, the Supreme Court did not reach the question whether enjoining use of Steele's mark would be an affront to Mexican sovereignty.[7] The Court did note, however, that the Lanham Act did not constrict prior law, and cited the earlier case of *George W. Luft Co., Inc. v. Zande Cosmetic Co., Inc.,* 2 Cir.1944, 142 F.2d 536, *cert. denied,* 1944, 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606. There, both parties were engaged in the manufacture and sale of cosmetics, and the defendant's mark, "Zande", first used in 1935, was found to infringe the plaintiff's mark, "Tangee", introduced in 1920. The district court granted a broad injunction, and prohibited the defendant from showing its right, established under

---

**6.** For a discussion of the extraterritorial jurisdiction of American antitrust laws *see* J. Atwood and K. Brewster, Antitrust and American Business Abroad (2d Ed. 1981); W. Fugate, Foreign Commerce and the Antitrust Laws (2d ed. 1973); Note, Extraterritorial Application of Federal Antitrust, 20 Vand.L.Rev. 1030 (1967); Comment, Extraterritorial Application of the Antitrust Laws, 70 Yale L.J. 259 (1960).

**7.** The Court of Appeals had held that the United States has the power to prevent the enjoyment of a trademark right specifically granted to one of its citizens by a foreign state. This question was again presented in a case with nearly identical facts and answered in the affirmative. *Ramirez and Feraud Chili Co. v. Las Palmas Food Co.,* S.D.Cal.1956, 146 F.Supp. 594, *aff'd per curiam,* 9 Cir.1957, 245 F.2d 874, *cert. denied,* 1958, 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357.

foreign laws, to use the tradename. The Second Circuit modified the breadth of the injunction, and held that such evidence would prohibit the district court from affecting the defendant's shipment to those countries where it had established a *superior* right to the trademark. As the Court stated:

Nor can we perceive upon what theory a plaintiff can recover damages for acts in the United States resulting in a sale of merchandise in a foreign country under a mark to which the defendant has established, over the plaintiff's opposition, a legal right of use in that country. Consequently, neither the injunction nor the accounting should cover activities of the defendants, either here or abroad, concerned with sales in countries where the defendants have established rights superior to the plaintiff's . . .

142 F.2d at 541.

 We conclude that under *Bulova* and *Luft* certain factors are relevant in determining whether the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction. These include the citizenship of the defendant, the effect on United States commerce, and the existence of a

conflict with foreign law. *See Vanity Fair Mills v. T. Eaton Co.,* 2 Cir.1956, 234 F.2d 633, 642, *cert. denied,* 1956, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76.[8] The absence of any one of these is not dispositive. Nor should a court limit its inquiry exclusively to these considerations.[9] Rather, these factors will necessarily be the primary elements in any balancing analysis.

 Riceland contends that the district court erred when it found that it was not deprived of the power to issue equitable relief, even though the ultimate sale of the defendant's Bint al-Arab and Gulf Girl brands occurred in Saudi Arabia and none of its products found their way back into the United States. Our reading of *Bulova* and *Luft* convinces us that no error was committed. It is undisputed that the defendant is an American corporation, based in Stuttgart, Arkansas, engaged in both interstate and foreign commerce. It is also clear, contrary to Riceland's assertions, that the defendant's Saudi Arabian sales had more than an insignificant effect on United States commerce. Each of Riceland's activities, from the processing and packaging of the rice to the transportation and distribution of it, are activities within commerce. And by unlawfully selling its products un-

**8.** In *Vanity Fair,* the Second Circuit, interpreting *Bulova,* stated that the degree of effect on United States commerce must be "substantial" before the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction. 234 F.2d at 642. This interpretation has been embraced by a few courts and commentators. *See Wells Fargo & Co. v. Wells Fargo Express Co.,* D.Nev.1973, 358 F.Supp. 1065, 1077, *vacated,* 9 Cir.1977, 556 F.2d 406; Rappeport, Trade-mark and Unfair Competition in International Conflict of Laws: An Analysis of the Choice of Law Problem, 20 U.Pitt.L.Rev. 1, 16 (1958). We agree with the Ninth Circuit that *Bulova* contains no such requirement, and that *some* effect may be sufficient. As the Court noted in *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d at 428, "since the origins of the 'substantiality' test apparently lie in the effort to distinguish between intrastate commerce, which Congress may not regulate as such, and interstate commerce, which it can control, it may be unwise blindly to apply the factor in the area of foreign commerce over which Congress has exclusive authority." *See also Timberlane Lumber Co. v.*

*Bank of America, N.T. & S.A.,* 9 Cir.1976, 549 F.2d 597, 612.

**9.** At least one Court has proposed a more exhaustive list of considerations to be weighed before extraterritorial jurisdiction is exercised:

The elements to be weighed include the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations of principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

*Wells Fargo & Co. v. Wells Fargo Express Co.,* 9 Cir.1977, 556 F.2d 406, 428–29, *quoting Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 9 Cir.1976, 549 F.2d 597, 614–15.

der infringing marks in Saudi Arabia, Riceland diverted sales from ARI, whose rice products are also processed, packaged, transported, and distributed in commerce regulated by Congress. Merely because the consummation of the unlawful activity occurred on foreign soil is of no assistance to the defendant. As the Supreme Court stated in *Bulova,* "we do not deem material that petitioner affixed the mark 'Bulova' in Mexico City rather than here, or that his purchases in the United States when viewed in isolation do not violate any of our laws. They were essential steps in the course of business consummated abroad; acts in themselves legal lose that character when they become part of an unlawful scheme." 344 U.S. at 287, 73 S.Ct. at 256, 97 L.Ed. at 325–26. There is also no requirement that the defendant's products bearing the infringing marks make their way back into the United States. *See Paco Rabanne, Etc. v. Norco Enterprises, Inc.,* 2 Cir.1982, 680 F.2d 891; *Hecker H–O Co. v. Holland Food Corp.,* 2 Cir.1929, 36 F.2d 767.

Riceland argues that even if its sales adversely affected commerce, the district court should have refrained from issuing an injunction because its acts were lawful in Saudi Arabia. The mark Bint al-Arab was created and is owned in that country by the merchant Alamoudi. It has been in use since 1978 for rice, when Riceland became a private label supplier to Alamoudi, and since 1977 for cooking oil. Under the Saudi Arabian Trade Marks Registration Code, any individual who uses a mark for more than a year before its registration by anyone else has at least a concurrent right to use that mark. Because ARI's Abu Bint mark is as yet unregistered in Saudi Arabia, the defendant points out, and because Alamoudi used the Bint al-Arab mark for more than one year, Alamoudi has a vested right to use the mark, and through him, Riceland. The district court's decision to enjoin the defendant's use of the infringing marks, therefore, interferes with the laws of another nation and runs contrary to the principles of international comity.

We cannot accept the defendant's contention. At best, Riceland has shown that Alamoudi, not it, has a concurrent right to use the Bint al-Arab mark. According to the defendant's own translation of the Saudi Arabian Trade Marks Registration Code, any right which Alamoudi may have acquired is "personal, non-inheritable and non-transferable to third parties".[10] Even were we to accept Riceland's contention that it possesses a concurrent right to use the mark, that right is not superior, as *Luft* requires, to the plaintiff's right. *See Luft,* 142 F.2d at 541. The defendant has not established, over the plaintiff's opposition, a legal right of use in Saudi Arabia. ARI has sought a Saudi registration for its Abu Bint mark since 1972, and the application is currently before that country's courts.[11] Absent a determination by a Saudi court that Riceland has a legal right to use its marks, and that those marks do not infringe ARI's Abu Bint mark, we are unable to conclude that it would be an affront to Saudi sovereignty or law if we affirm the district court's injunction prohibiting the defendant from injur-

---

**10.** Chapter 2, Paragraph 19 of the Saudi Trade Marks Code provides as follows:

Anyone whose trade mark is registered shall be deemed to be its sole owner, and the right of calling the ownership of such a trade mark into question shall abate if the person who registers the said trade mark uses it continually for at least five years as of the date of registration, provided that no proper legal action is brought against such person in regard to such registration. *However, if anyone proves that he has the said trademark and utilized it, continually for one year prior to registration, before anybody else, then he shall acquire the right to take hold of such a trademark, and such right shall be personal,*

*non-inheritable and non-transferable to third parties.* (emphasis added.)

**11.** According to the defendant's own translation of the Saudi Trade Marks Code, if ARI's registration is ever granted it will be retroactive to the date of the application, six years before Riceland began marketing its Bint al-Arab rice through Alamoudi. Chapter 2, Paragraph 13 of the Saudi Code provides:

Upon receiving the application, the registrar shall give the applicant a receipt wherein the date of submission shall be mentioned, and such date shall thereafter be deemed to be the registration date.

ing the plaintiff's Saudi Arabian commerce conducted from the United States. *See Ramirez & Feraud Chili Co. v. Las Palmas Food Co.,* S.D.Cal.1956, 146 F.Supp. 594, 602, aff'd per curiam, 9 Cir.1957, 245 F.2d 874, cert. denied, 1958, 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357.[12]

■ Riceland's reliance on *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 2 Cir.1956, 234 F.2d 633, is misplaced. There the defendant, a Canadian corporation, registered in 1915 the trademark "Vanity Fair" in Canada. The plaintiffs, holders of the same trademark in the United States since 1914, and doing business under that name in Canada since 1917, attempted to register the mark in Canada in 1919. The application was rejected, however, because of the defendant's prior registration. In 1954, the plaintiffs brought suit in New York to enjoin the Canadian use of the name. The only contact the defendant had with the United States was a sales office in New York, and except for a few mail order sales into the United States through this office, the passing off occurred in Canada. "The crucial issue in the case was the validity of the defendant's Canadian trademark registration under Canadian trademark law". 234 F.2d at 646. Although the defendant's conduct had a substantial effect on American commerce, the Court found *Bulova* distinguishable and held that Congress did not intend that the Lanham Act reach "acts committed by a foreign national in his home country under a presumably valid trademark registration in that country". 234 F.2d at 642. In refusing to determine the validity of the Canadian registration, the

court followed the act of state doctrine, applicable when exclusive rights are conferred by the act of a foreign sovereign, the ramifications of which we may avoid. Here, unlike in *Vanity Fair,* the defendant possesses no superior foreign right to use the trademarks in question. And here, unlike in *Vanity Fair,* the defendant is an American corporation. "No principle of international law bars the United States from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations are not infringed. Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits." *Scotch Whisky Association v. Barton Distilling Co.,* 7 Cir.1973, 489 F.2d 809, 812. *See also* Kerios, Territoriality and International Copyright Infringement Actions, Copyright Law Symposium No. 22, at 53, 65 (1977).

### III.

Riceland next argues that even if the Lanham Act could reach the conduct complained of, and that the district had jurisdiction to issue equitable relief, it nevertheless should have declined to exercise jurisdiction under the doctrine of forum non conveniens. The interests of the litigants in this case, it contends, point toward Saudi Arabia as the proper forum. Most of the evidence and witnesses are in that country, and compulsory process is not now available to the defendant. Moreover, Saudi Arabia has a stronger interest in investigating and

---

**12.** *Ramirez* presented a question similar to the one we now confront. The plaintiff registered in the United States the trademark "Las Palmas," and sold its products, Spanish foods and sauces, in both domestic and foreign commerce. Some years later the defendant registered the same name in Mexico, and began printing identical labels in the United States. Counterfeit labels, cans, and cartons were transported across the border, and were packed and marketed there by the defendant. Visiting Americans purchased the goods and brought them back into the United States. The court assumed the Mexican registration to be valid, but went on to hold that the exercise of

jurisdiction would not impugn foreign law or interfere with the sovereignty of another nation. As the court stated:

> For at most defendants' Mexican registration of plaintiff's mark can have no greater effect than to confer upon defendants a license or permission to use the mark in Mexico. *It is not even contended that any public policy of Mexico requires defendants ever to exercise that license.* (emphasis added).

146 F.Supp. at 602. *See also Bulova Watch Co. v. Steele,* 5 Cir.1952, 194 F.2d 567, 571, aff'd on other grounds, 1952, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252.

preventing alleged confusion in the Saudi marketplace than does the United States. By exercising jurisdiction, the district court perpetrated an injustice. Its action, therefore, should be reversed as a clear abuse of discretion. *See Poseidon Schiffahrt, G.M. B.H. v. The M/S Netuno*, 5 Cir.1973, 474 F.2d 203, 205.

■ It is true, as Riceland asserts, that even though a district court has the power to hear a case, in certain circumstances it is appropriate for it to decline to exercise that power. Those circumstances were enumerated by the Supreme Court in *Gulf Oil Corporation v. Gilbert*, 1947, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055, the leading decision outlining the application of the forum non conveniens principle. The Court stated that "[t]he principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction when jurisdiction is authorized by the letter of a general venue statute". 330 U.S. at 507, 67 S.Ct. at 842, 91 L.Ed. at 1062. The doctrine "presupposes at least two forums in which the defendant is amenable to process ... [and] furnishes criteria for choice between them." *Id.* Although "the combination and weight of factors requisite to given results are difficult to forecast or state," 330 U.S. at 508, 67 S.Ct. 843, 91 L.Ed. at 1062, among the factors of "private interest" listed by the Court were accessibility of proof and witnesses, enforceability of any resulting judgment, and the ease and expense of litigation in the forum. Such factors allow a court to "weigh relative advantages and obstacles to fair trial". *Id.* A trial court should also look to "public interest" factors such as the burden created for local court calendars and local juries by trials having no connection with the forum. The Court stressed that "[t]he doctrine leaves much to the discretion of the court. . . . But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed". *Id.*[13]

■ We conclude that Riceland has failed to shoulder the heavy burden imposed by *Gilbert* of showing that the district court abused its discretion when it refused to dismiss the suit on forum non conveniens grounds. That some of the evidence and witnesses are located in Saudi Arabia will certainly add to Riceland's expense and inconvenience in defending this suit. But the facts are insufficient to relegate an American plaintiff to a foreign court when American law, rather than foreign law, is applicable. Here a United States corporation seeks relief under the trademark and unfair competition laws of this country to enjoin unlawful acts committed here and abroad by another United States corporation. These facts alone convince us that the district court did not abuse its discretion when it denied the defendant's motion. *Piper Aircraft Co. v. Reyno*, 1981, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419, is not to the contrary. There the factors supporting the foreign forum were far more substantial than they are in this case: Scottish and English citizens died in an accident in Scotland in an aircraft owned and operated by United Kingdom companies.

## IV.

■ We have reviewed the defendant's other contentions and find them to be without merit.[14] Accordingly, the judg-

---

**13.** For a discussion of how poorly defendants asserting forum non conveniens have fared, *see* Note, The Convenient Forum Abroad Revisited: A Decade of Development of the Doctrine of Forum Non Conveniens in International Litigation in the Federal Courts, 17 Va.J.Int.L. 755, 781–90 (1977).

**14.** Among the numerous other contentions is that the district judge applied an incorrect legal standard in determining whether Riceland infringed ARI's registered marks and violated its common law rights. Consequently, the court's

findings of fact are not shielded from review by the clearly erroneous standard. *See Chevron Chemical Co. v. Voluntary Purchasing Group*, 5 Cir.1981, 659 F.2d 695, 703, *cert. denied*, —— U.S. ——, 102 S.Ct. 2947, 73 L.Ed.2d 1342; *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 5 Cir.1977, 549 F.2d 368, 384. We disagree. Under both 15 U.S.C. §§ 1114 and 1125(a), judicial inquiry focuses on the likelihood of consumer confusion, and to determine whether such a likelihood exists the dis-

ment of the district court enjoining the Arkansas Rice Growers Cooperative Association, d/b/a Riceland Foods, from using, directly or indirectly, in connection with its rice sales, packaging, exportation and promotion, a single girl design trademark, a single girl name, or any colorable imitation of the Abu Bint trademark and dress is

AFFIRMED.

trict court should examine "a variety of factors, or 'digits,' including the defendant's intent, the similarity of design, actual confusion, the similarity of product, the similarity of retail outlets and purchasers, and the similarity of advertising media used". *Chevron,* 659 F.2d at 703. The district court made such an inquiry in this case. Although there is language in the opinion which, if read alone, would indicate that a "might be likely to confuse" test was applied, our reading of that language in the context in which it appears convinces us that no error was committed. No fewer than seven times does the district court's opinion correctly refer to the "likelihood of confusion test".

Similarly without merit is Riceland's argument that the suit should be dismissed under Rule 19(b), Fed.R.Civ.P., because of the absence of an indispensable party, Alpha Trading Company. The district court found that ARI did not intend to assign and has not assigned any ownership rights to Alpha. This finding is not clearly erroneous. Testimony at the hearing revealed that instead of being a co-owner, Alpha was retained as ARI's exclusive agent to help register the Abu Bint mark.