**SCANVEC AMIABLE LIMITED; Scanvec Amiable Inc.,**

v.

**Jim CHANG; Yuan Chang, also known as Charlie Chang; Randy R. Nepomuceno; Luciana Chang; Amica Software, Inc., also known as Amiable Software, Inc.; Amica China, Inc.; Amica China Co., Ltd. Amica Software, Inc., Jim Chang and Luciana Chang, Appellants (Amended in accordance with Court's Order dated 4/10/03).**

**Nos. 02–4385, 03–1043.**

United States Court of Appeals, Third Circuit.

Argued Sept. 16, 2003.

Decided Oct. 15, 2003.

Francis P. Newell, Leonard A. Busby, (Argued), Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Appellants.

Michael W. McTigue, Jr., (Argued), Drinker, Biddle & Reath, Philadelphia, PA, for Appellees.

Before McKEE, SMITH and COWEN, Circuit Judges.

## OPINION

COWEN, Circuit Judge.

Amica Software, Inc., Jim Chang and Luciana Chang (together "Amica") appeal two orders of the District Court concerning a temporary restraining order and a preliminary injunction entered in favor of appellees Scanvec Amiable Limited and Scanvec Amiable, Inc. (together "Scanvec"). Amica argues that the Court erred by declining to impose retroactive security for the TRO after the order was dissolved by the entry of the preliminary injunction. In a separate appeal, Amica challenges the District Court's decision to expand the preliminary injunction without conducting an evidentiary hearing, or increasing the amount of the security bond. As part of this second appeal, Amica also argues that the District Court's findings concerning civil conspiracy, misappropriation of trade secrets, and unfair competition are erroneous, and that the District Court exceeded its jurisdiction under the Lanham Act. We find no abuse in the District Court's discretionary determinations, and no reversible errors of law in either order. Accordingly, we will affirm.

## I.

This case arises from the establishment of a computer software company by former officers, directors, and employees of Scanvec. Scanvec develops computer programs sold throughout the world. Scanvec's premier product is PhotoPRINT, a program that creates computer images for printing on wide form at digital printers ("WFPs"). Approximately one-third of Scanvec's PhotoPRINT sales are made to original equipment manufacturers ("OEMs") of WFPs, including Hewlett–Packard and Roland DG Corporation. Scanvec designed private-label versions of PhotoPRINT for these OEMs by, in part, customizing the International Color Consortium Color Profiles ("ICC Profiles") needed to produce accurate digital reproductions on WFPs.

PhotoPRINT was originally designed and sold by Amiable Technologies, a company owned by Defendants Jim Chang and Yuan Chang. In 1998, Amiable merged into Scanvec, and Jim and Yuan became shareholders in, and board members of, the new company. The Changs' employment agreements prohibited both from competing with Scanvec for two years after their departure. In July 1999, Jim Chang was fired from his position as President of Scanvec. In November 2001, Jim and Yuan resigned from Scanvec's board.

In May 2001, prior to their resignation, the Changs launched a new software company in China called Amica. Yuan Chang was listed as Amica's legal representative, and Amica used Scanvec's Beijing office as its company address. In the fall of 2001, Jim Chang's wife Luciana brokered an agreement that terminated all of Scanvec's Chinese distributors in favor of an exclusive contract with a company called SunPack. SunPack, however, shared the same office space as Amica (which, as noted, was also Scanvec's space). In November 2001, SunPack changed its name to Jia Peng Si Hai, which was essentially Amica's Chinese trade name. Scanvec's representative to SunPack, Kevin Sun, clandestinely worked for Amica through the end of 2001.

In early 2002, Amica hired several of Scanvec's former software engineers and began marketing ColorPRINT, a program (like PhotoPRINT) for printing images on WFPs. Early versions of ColorPRINT, and a similar product called ImaRIP, incorporated hundreds of Scanvec's ICC Profiles.

Finally, Jim Chang entered into a contract with Roland DG to produce a private-label version of ColorPRINT (called Roland Select Color, or "RSC") for Roland's new line of WFPs. One of Roland's requirements for RSC was the creation of a customized rendering intent similar to the one used by Scanvec in PhotoPRINT known as "SpotColor." Pursuant to this agreement, ColorPRINT's source code included references to SpotColor, although, as discussed further below, the functionality of the rendering intent remains unclear.

Scanvec commenced this action on August 27, 2002 by filing a complaint and an ex parte motion for a temporary restraining order. On the same day Judge Berle M. Schiller, sitting as emergency judge, entered the requested TRO without requiring the posting of a security bond, or making any findings as to why a bond was unnecessary. The case was then assigned to Judge Petrese B. Tucker, who conducted a six-day hearing on the requested preliminary injunction between September 6 and September 13. Amica did not object to the continuation of the TRO during the hearing, and pending a ruling on the preliminary injunction.

On October 3, 2002, the District Court granted Scanvec's application for a preliminary injunction in part, enjoining Amica from using certain trademarks, trade secrets, and goodwill. The District Court solicited the parties' recommendations on the amount of security, and following their response, set a bond requirement of $390,000 on November 4, 2002. The District Court also determined that no security requirement would be imposed for the period during which the TRO was in place.

On October 18, 2002, Scanvec filed an emergency motion for reconsideration of the October 3 order citing newly discover-ed evidence demonstrating that the Amica defendants had made material misrepresentations during the injunction hearing. On November 12, 2002, following opening and opposition briefs, Scanvec filed a motion for leave to file a reply brief, attaching the proposed brief to the new motion. On November 15, Scanvec sought leave to file an additional supplement. On December 17, 2002, the District Court granted Scanvec leave to file the supplemental materials, and directed that Amica file any opposing materials by December 19. Amica timely filed its response, but argued that it did not have sufficient time to address all of the allegations raised in Scanvec's supplements.

On December 23, 2002, the District Court granted Scanvec's motion for reconsideration and expanded the preliminary injunction to prevent Amica from selling ColorPRINT, and its derivative products. The District Court's order stated that the security of $350,000 previously posted by Scanvec was sufficient to support the expanded injunction.

Amica filed a motion to stay the expanded injunction on December 30, which the District Court denied on January 6, 2003. On January 10, 2003, Amica filed a motion to stay pending appeal with this Court, which this Court denied on January 27, 2003.

## II.

■ Amica first appeals[1] the District Court's November 4, 2002 order declining to impose a security bond for the TRO period between August 27 and October 3. We agree that the District Court's failure to justify the waiver of a security bond is erroneous, but conclude that we cannot retroactively increase the amount of security imposed during the period of the now-

---

1. Appeal number 02–4385.

expired TRO. Accordingly, the District Court's November 4 order will be affirmed.[2]

Federal Rule of Civil Procedure 65(c) states that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper." We have strictly interpreted the bond requirement of Rule 65(c), noting that "[w]hile there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 110 (3d Cir.1988). In some instances, strict application of the security requirement may be inappropriate, and "at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir.1991) (quoting *Crowley v. Local No. 82 Furniture & Piano*, 679 F.2d 978, 1000 (1st Cir.1982)). This exception, however, remains narrow and may only be invoked by the District Court upon specific findings "regarding the relative hardships to each party." *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir.1996). Waiver of the bond requirement without such findings necessitates a remand for reconsideration. *Id.; Temple*, 941 F.2d at 220.

Nonetheless, reversal of the November 4 order and remand for imposition of an increased security amount is not appropriate. The decisions in both *Elliott* and *Temple* involved appeals from then-existing injunctions. In this case, the August 27 TRO has expired, and been replaced by a preliminary injunction. Amica concedes this point, explaining that it seeks to obtain "a retroactive bond in order to satisfy a damages award." Blue Br. at 42. However, we have recently held that "[a] retroactive increase in the amount of an injunction bond on dissolution or reversal is generally improper." *Sprint Communications Co. v. Cat Communications Int'l*, 335 F.3d 235, 241 (3d Cir.2003).

In *Sprint*, the district court entered a preliminary injunction secured by a $250,000 bond. *Id.* at 238. More than one-year later, the restrained party had accrued significant costs complying with the injunction, and sought to terminate the restraint. *Id.* at 239. The district court dissolved the injunction, and simultaneously increased the amount of the bond to 4.95 million dollars. *Id.*

We held that the retroactive increase was improper, explaining that the security requirement of Rule 65(c) informs the applicant "the price it can expect to pay if the injunction was wrongfully issued." *Id.* at 240 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 805 (3d Cir.1989)). In this manner, the applicant may base its decision to accept the injunction "on whether it wants to expose itself to liability up to the bond amount." *Id.* In contrast, "[i]f a retroactive increase is permissible, the injunction bond is no longer cabined; the bond no longer fixes exposure nor caps liability. A retroactive increase subjects the successful applicant

---

2. Amica argues we may exercise jurisdiction over the November 4 order under the collateral order doctrine. We need not consider this argument, because jurisdiction is also proper under 28 U.S.C. § 1292(a)(1), which governs interlocutory orders "granting, continuing, modifying, refusing, or dissolving injunctions...." The November 4 order modified the October 3 order by imposing a security requirement of $390,000 not previously required. *Compare* App. at 1544–1549 (October 3 order), *with* App. at 33–39 (November 4 order); *see Sprint Communications Co. v. Cat Communications Int'l*, 335 F.3d 235, 239 n. 3 (3d Cir.2003).

to an unexpected and unanticipated liability." *Id.* at 240–41; *accord Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032 (7th Cir.2000).

*Sprint* dictates the same result in this case. Increasing the amount of the security required for the August 27 TRO, albeit set at zero, after that injunction had been dissolved by the October 3 order would retroactively increase Scanvec's potential liability. Scanvec accepted the injunctive relief ordered by the District Court on the belief that it was not required to post any security; imposing a retroactive increase now would "subject[ ] the successful applicant to an unexpected and unanticipated liability." *Sprint*, 335 F.3d at 241.

We note, of course, that unlike *Sprint* the District Court here failed to require any security. However, this error persisted because of Amica's own delay in challenging the TRO. App. at 34 n. 3, 233, 441, 679, 1033 (consenting to continuations of the TRO without bond). Amica could have withheld its consent to the TRO extensions, filed an interlocutory appeal after the expiration of twenty days, and argued that the failure to require security was erroneous. *Nutrasweet Co. v. Vit–Mar Enters., Inc.*, 112 F.3d 689, 692 (3d Cir. 1997) (noting that if a TRO is continued for more than twenty days, "[t]he most prevalent view" is that the order will be "treated as the equivalent of a preliminary injunction and thus subject to appellate review"); *see also Prof'l Plan Examiners of New Jersey, Inc. v. Lefante*, 750 F.2d 282, 288 (3d Cir.1984). Indeed, Amica could have simply informed the District Court that the TRO would not take effect without a determination under Rule 65(c). We have long held that the posting of adequate security is a "condition precedent" to injunctive relief. *Hopkins v. Wallin*, 179 F.2d 136, 137 (3d Cir.1949); *see also*

*Sprint*, 335 F.3d at 239 ("Generally, a bond is a condition of preliminary injunctive relief."); *Frank's GMC*, 847 F.2d at 103 (noting Rule 65(c) "mandates" that the successful applicant post adequate security). Amica thus had ample authority with which to immediately argue to the District Court that the TRO would not commence until the court determined, and Scanvec posted, adequate security. Amica's failure to challenge the security determination, and its decision to accept continued extensions of the TRO without adequate security, do not justify a departure from *Sprint's* disapproval of retroactive bond increases. Accordingly, the District Court's decision was not erroneous.

## III.

Amica separately appeals[3] the District Court's December 23, 2002 order granting Scanvec's motion to reconsider the October 3 order, and expanding the preliminary injunction to prohibit all production of ColorPRINT and its derivatives.

### A. Failure to Conduct a Hearing on the Motion for Reconsideration

Amica first argues that the District Court abused its discretion by issuing an expanded injunction without first conducting an evidentiary hearing on the motion for reconsideration. We review this decision only for an abuse of discretion. *Elliott*, 98 F.3d at 53. A district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact without first holding an evidentiary hearing. *Elliott*, 98 F.3d at 53; *Prof'l Plan Examiners*, 750 F.2d at 288. In contrast, an injunction may issue on the basis of affidavits and other documentary evidence "if the facts are undisputed

---

3. Appeal number 03–1043.

and the relevant factual issues are resolved." *Bradley*, 910 F.2d at 53–54.

■ The District Court's decision to expand the injunction without a second hearing was not an abuse of discretion. The Court's decision arose from a motion for reconsideration, and after a six-day hearing on the merits of Scanvec's application. Therefore, the District Court did not issue its order without any hearing, or record testimony. Rather, the District Court's opinion indicates that the documentary evidence offered by Scanvec undermined the credibility of Amica's witnesses, and supported an inference of conspiracy.

Amica responds that a hearing would have resolved the inconsistencies in the witnesses' testimony. However, as the District Court reasonably noted:

> "Amica Defendants' responses to Plaintiffs ... do not even attempt to mount a defense against these serious allegations, contending only that the [new evidence] is 'irrelevant' and a 'peripheral issue'. The only inference that can be drawn from this evidence is that Plaintiffs are correct...." App. at 28.

Amica then attempts to argue that the District Court's briefing schedule allowed insufficient time to respond to the new evidence. This argument ignores the fact that Amica had the supplemental materials for some two months prior to the District Court's decision to accept the materials as filed. More significantly, Amica has never identified what it would have demonstrated with more briefing time or a hearing. *See Elliott*, 98 F.3d at 54–55 (rejecting conclusory challenge to district court's failure to hold hearing).

The District Court's six-day hearing was a sufficient evidentiary background on which to evaluate the supplemental documentary evidence. Further, Amica has not demonstrated what evidence it would have offered in reply. Accordingly, the District Court's decision to enter the expanded December 23 injunction was not an abuse of discretion.

## B. Denial of Request to Increase the Security Bond

Closely related to Amica's argument in appeal number 02–4385 is the claim that the District Court abused its discretion by failing to increase Scanvec's security bond when it granted the motion for reconsideration, and expanded the scope of the preliminary injunction. Amica essentially argues that it is an abuse of discretion not to raise the amount of security when an injunction becomes drastically more restrictive.

Amica's argument is without merit. The amount of security required for an injunction under Rule 65(c) is left to the discretion of the district court. *Frank's GMC*, 847 F.2d at 103. The December 23 order states that the District Court considered whether additional security was required, but declined to increase the bond. App. at 10 (stating "that security of $390,000 already posted by plaintiffs is sufficient"). Moreover, the District Court's November 4, 2002 order calculated the security requirement to include $240,000 in expenses identified by Amica, and an additional $150,000 in recognition of "significant additional losses" at risk in the litigation. App. at 39. The District Court's written decision that this combined amount was sufficient to support the expanded injunction is not an abuse of discretion.

## C. Basis for the Expanded Preliminary Injunction

The substantive heart of Amica's appeal argues that the District Court's findings concerning civil conspiracy, misappropriation of trade secrets and unfair competition are erroneous, or an abuse of discre-

tion. Amica essentially argues that taken separately, each of these three allegations do not sustain the broad injunction entered by the District Court.

### 1. Civil Conspiracy

Under Pennsylvania law, a civil conspiracy requires an agreement with intent to participate in an unlawful act. *Scully v. U.S. Watts, Inc.*, 238 F.3d 497, 516 (3d Cir.2001) (quoting *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 472 (1979)). This showing "may be proved by acts and circumstances sufficient to warrant an inference that the unlawful combination had been in point of fact formed for the purpose charged." *Id.* (quoting *Fife v. Great Atl. & Pac. Tea Co.*, 356 Pa. 265, 52 A.2d 24, 27 (1947)).

■ Here, the District Court found a likelihood of a civil conspiracy based on Amica's role in cancelling Scanvec's Chinese distribution, Amica's usurpation of Scanvec's Chinese office, Amica's recruitment and hiring of Scanvec programmers, and SunPack's summary termination of its agreement with Scanvec after only two months. The Court concluded that this chain of events demonstrated that Scanvec was fraudulently induced into terminating its distribution network so that Amica could fill the void created by Scanvec's exit from the market. The District Court found that Amica did "not even attempt to mount a defense against these serious allegations," a conclusion supported by the record. App. at 28. Accordingly, the District Court's finding of a likelihood of success on this point is correct.

### 2. Misappropriation

Amica argues that the District Court erred in relying on evidence of source code copying in finding a likelihood of success on the merits of Scanvec's state law misappropriation claim. Citing the Declaration of a former Scanvec employee, the District Court found that "[t]he ColorPRINT source code lists 'SpotColor' as one of the software's rendering intents." App. at 21. In response to this testimony, the Court found that "Jim Chang did not explain how Scanvec's SpotColor rendering intent was incorporated into the ColorPRINT source code, particularly since the ColorPRINT does not use the feature." App. at 21.

Amica argues that this finding of source code copying is based on an erroneous understanding of the technology used in RIP software. Amica concedes that Color-PRINT contained "references" to the term SpotColor. However, Amica argues that these references were merely placeholders inserted by the programmers to indicate where Amica's own rendering intent would be constructed. In other words, Amica contends that the SpotColor references were not code at all, but merely "notes" to indicate *where* the as-yet unwritten code would be placed. Jim Chang's declaration explains that:

> Roland specifically requested from Amica a rendering intent in order to print "spot colors" correctly. Amica included reference to a fifth rendering intent of "SpotColor" in preparation for adding this feature at a later date, when it was intended that ColorPRINT would be adapted to process images in Adobe's Postscript format....[4] Because the ColorPRINT version analyzed by [Scanvec] was not ready to process Adobe Postscript, no fifth rendering intent was ever used in the ColorPRINT beta version created at that time.

App. at 1691. This, Amica argues, entirely explains why "non-functioning code" was

---

4. Adobe is a third-party software manufacturer that sells some of the most widely-used software for text and image processing. *See* www.adobe.com (last visited Aug. 25, 2003).

included in ColorPRINT: because it wasn't code at all, merely a reference to a feature that would be added at a later time.

The District Court's analysis of this issue is problematic. Under Pennsylvania law, the tort of misappropriation of trade secrets requires the disclosure or use of a trade secret. *Advanced Power Sys. v. Hi–Tech Sys.*, 801 F.Supp. 1450, 1454 (E.D.Pa. 1992) (citing *Den–Tal–Ez, Inc. v. Siemens Capital Corp.*, 389 Pa.Super. 219, 566 A.2d 1214, 1228–29 (1989)). The District Court did not determine whether the instances of SpotColor contained in ColorPRINT were source code, or simply references to a group of source files *containing* the source code for a rendering intent.

The District Court's findings also lack sufficient factual support for an inference that Amica copied Scanvec's code. Federal cases addressing code copying allegations under the Copyright Act hold that copying may be established by indirect evidence that the defendant had access to the protected materials, and that the two programs demonstrate "substantial similarities." *Whelan Assocs. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1231–32 (3d Cir.1986). The court may receive expert and lay testimony to determine whether a substantial similarity exists. *Id.* at 1232–33. Here, there is no evidence in the record that ColorPRINT's rendering intents were substantially similar to PhotoPRINT. Rather, the declaration submitted by Scanvec shows only that Amica incorporated a substantially similar title reference, and not some functional program element.

In addition, the District Court appears to have assumed that the SpotColor reference, and perhaps all of Scanvec's PhotoPRINT source code, was a protected trade secret. Federal courts applying the Copyright Act have constructed an intricate framework for determining whether source code is protected. Once the court has found copying, either express or inferred, it considers whether the copied elements are protected expressions. *Id.* at 1234–35; 17 U.S.C. § 102(b). We have explained the distinction between protected expressions and unprotected ideas by "reference to the end sought to be achieved by the work in question," distinguishing between "the purpose or function of a utilitarian work" and "everything that is not necessary to that purpose or function." *Whelan*, 797 F.2d at 1236. The District Court did not perform a similarly rigorous analysis of the elements of PhotoPRINT and the allegedly misappropriated portions of ColorPRINT. Instead, the Court based its conclusion on credibility, finding that Jim Changs's testimony merited "little credence." App. at 25. This finding, however, does not explain whether Scanvec's SpotColor was a protected trade secret, and whether Amica used or disclosed that secret as required for an actionable claim under Pennsylvania law. *Hi–Tech Sys.*, 801 F.Supp. at 1444.

■ Similar problems attain to the District Court's finding that Amica incorporated "hundreds of PhotoPRINT ICC color profiles" and that this incorporation could not be explained away as the result of reverse engineering or mistake. App. at 27. As with the instances of SpotColor, the District Court did not determine whether Scanvec's ICC Profiles were protected as trade secrets, a requirement for misappropriation under Pennsylvania law. For these reasons, the District Court erred in finding a likelihood of success on the merits of Scanvec's misappropriation and copying claims.

### 3. Unfair Competition

The District Court also entered the preliminary injunction based on a likelihood

that Scanvec would succeed on the merits of its common law unfair competition claim. Despite the equal importance of this finding to the District Court's analysis, Amica has failed to challenge this finding on appeal. We have "repeatedly emphasized that failure to raise a theory as an issue on appeal constitutes a waiver," by ignoring the requirement that briefs contain "statements of all issues presented for appeal, together with supporting arguments and citations." *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir.1992). Amica's statement that it appealed "all aspects" of the District Court's order, and the suggestion that its opening brief cited to "the part of the District Court's Opinion relating to unfair competition," falls far short of this standard. Amica's briefing does not address the District Court's findings of unfair competition, and does not explain how these findings are erroneous under Pennsylvania law. Moreover, Amica's brief does not cite any authorities explaining the standards for unfair competition, and confines its legal arguments to the issue of misappropriation. Because of these omissions, it is impossible to determine the factual and legal basis for Amica's purported appeal.

Nonetheless, even if we were to reach the merits of this issue, the District Court's conclusions are proper. A claim of unfair competition under Pennsylvania law requires proof that the defendant has "passed off" the goods of one manufacturer or vendor as those of another, thus creating confusion between his own goods, and those of the rival. *Penn. State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 870–71 (Pa.Super.Ct.1998) ("The gist of the action lies in the deception practiced in 'passing off' the goods of one for that of another."); *see also Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F.Supp.2d 567, 582 (E.D.Pa.2002) (noting that com-

mon law cause of action for unfair competition in Pennsylvania mirrors the requirements of section 43(a) of the Lanham Act).

■ Here, the District Court found that Amica "willfully converted PhotoPRINT ICC Profiles en masse for use in the various versions of ColorPRINT," while "falsifying the copyright information for the profiles to denote" Amica as the copyright holder. App. at 27. The District Court then concluded that Amica sold this misbranded product to Scanvec's former customers, resulting in "incalculable damage to Plaintiffs' reputation and goodwill in the RIP software industry." App. at 29. As Pennsylvania courts have noted, "the trading on another's business reputation by use of deceptive selling practices or other means is enjoinable on the grounds of unfair competition." *Univ. Orthopedics*, 706 A.2d at 871 (quoting *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 848 (1957)). The conduct cited by the District Court supports the conclusion that Amica passed off ColorPRINT as Scanvec's product, using Scanvec's distribution network. Hence, even if we were to address this issue, we would find no error in the District Court's analysis.

Accordingly, although the District Court erred in entering the December 23 injunction on the basis of Scanvec's misappropriation claims, the injunction is soundly supported by the findings of civil conspiracy and unfair competition. Therefore, the conduct enjoined by the District Court was not an abuse of discretion, error of law, or clear mistake, and will be affirmed.

## D. Lanham Act Jurisdiction

Amica argues that the District Court erred in exercising jurisdiction under the Lanham Act to enjoin Amica's sales in China. The Lanham Act allows federal courts to enjoin extraterritorial conduct

when necessary to prevent harm to commerce in the United States. *Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952). A proper invocation of extraterritorial jurisdiction under the Lanham Act depends on: 1) whether the defendant is a United States citizen; 2) conflicts between the defendant's trademark rights under foreign law and the plaintiff's rights in the United States; and 3) whether the defendant's conduct has a substantial or significant effect on domestic commerce. *Atl. Richfield Co. v. ARCO Globus Int'l Co.,* 150 F.3d 189, 192 (2d Cir.1998); *Nintendo of Am., Inc. v. Aeropower Co.,* 34 F.3d 246, 250–51 (4th Cir. 1994); *Am. Rice, Inc. v. Ark. Rice Growers Co-op. Ass'n,* 701 F.2d 408, 414 (5th Cir.1983) (requiring effect on commerce to be "more than insignificant"); *and see Reebok Int'l, Ltd. v. Marnatech Enters., Inc.,* 970 F.2d 552, 555 (9th Cir.1992) (expanding the conflict of laws analysis into a seven-part inquiry); *see also* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 29:58 (West 2003) (collecting cases). Amica has raised only the third of these factors, arguing that Scanvec provided no evidence that the sale of ColorPRINT in China sufficiently affected United States commerce for jurisdiction.

The District Court considered the impact of Amica's sales and conspiratorial actions in finding a jurisdictionally sufficient nexus to American commerce. Amica availed itself of business opportunities inside the Unites States. Amica solicited customers at U.S. trade shows, suggesting plans for domestic expansion, App. at 28; 565–67. Amica developed essential elements of its ColorPRINT software, including the disputed ICC Profiles, from Scanvec programs designed in the United States. App. at 27. Finally, the District Court found that the confusingly similar marks and designations contained in ColorPRINT damaged Scanvec's goodwill and reputation within the domestic RIP software market. App. at 29. In all, the record indicates that Amica orchestrated its actions in China from the United States, using materials and customers developed in this country to materially further the launch of a confusingly similar product overseas. These facts show that Amica's domestic activities formed an essential step in carrying out its foreign conspiracy, resulting in the substantial impairment of Scanvec's business reputation in the United States. Accordingly, we are satisfied that Scanvec has satisfied the commercial nexus requirement of *Steele.*

### III.

For the foregoing reasons, the orders of the District Court entered on November 4, 2002 and December 24, 2002, will be affirmed.