**ADVANCED POWER SYSTEMS, INC.**

v.

**HI–TECH SYSTEMS, INC., et al.**

Civ. No. 90–7952.

United States District Court,
E.D. Pennsylvania.

Aug. 3, 1992.

Francis X. Manning, Philadelphia, Pa., John B. Hammalian, Stephen R. Harris, Wayne, Pa., for plaintiff Advanced Power Systems, Inc.

Roy S. Cohen, Stephen N. Huntington, Philadelphia, Pa., James R. Freeman, Phoenixville, Pa., for defendant Hi–Tech Systems, Inc.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

This action presents competing claims between two vendors of battery power systems for telecommunications, computers, and machinery. Plaintiff Advanced Power Systems, Inc. ("APS") was formed in 1989 by two former employees of defendant Hi–Tech Systems, Inc. ("Hi–Tech"), Gregory Presson and James McDevitt. These companies are now direct competitors. APS filed suit against Hi–Tech and its principals, claiming that they engaged in a series of activities designed to undermine APS's operations and competitiveness. The complaint included various state law causes of action, among these misappropriation of trade secrets and civil conspiracy, and a RICO claim. Thereafter, in a flurry of counterclaims and amended counterclaims, Hi–Tech made similar allegations against APS, Presson, and McDevitt. At issue today is the motion of plaintiff APS to dismiss all eight counts of the amended counterclaim for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6).[1]

### I. Factual and Procedural History

Hi–Tech's amended counterclaim—which is actually its third amended counterclaim—tells the following story, the content of which is taken as true for purposes of this motion. Hi–Tech was founded by defendant Robert Smith in August, 1982 to sell battery power systems. Gregory Presson, now the president of APS, worked for Hi–Tech from March, 1984 until April, 1989, at which time he resigned as Standby Power Sales Manager. James McDevitt, the other principal of APS, worked for Hi–Tech for approximately three years until he was discharged on September 13, 1988 from his job as service manager. Although they left Hi–Tech, Presson and McDevitt took with them a valuable computer program developed by Hi–Tech containing a variety of information about Hi–Tech's customers and put it to use at APS. Additionally, APS convinced seven Hi–Tech employees to come to work for APS.

While at Hi–Tech, Presson and McDevitt worked mostly on sales and services for

---

1. As a formal matter, the only issue before me today is whether to dismiss claims *against APS*. The present motion—captioned "Motion to Dismiss Counterclaim of Defendant Hi–Tech Systems, Inc. Against Plaintiff Advanced Power Systems, Inc."—simply incorporates an earlier motion to dismiss that addressed the first amended counterclaim against APS alone. As such, this motion does not deal with claims against the subsequently added principals of APS. However, the threshold sufficiency of the claims against the APS principals was briefed by both parties in the context of defendant's petition to file an amended counterclaim against the principals. Moreover, the claims against APS and its principals raise substantially similar, if not identical, issues. For these reasons, I regard the previously stated objections to Hi–Tech's claims against the APS principals as having been incorporated in the instant motion to dismiss.

Hi–Tech's largest customer, the Rolm Division of IBM. Shortly after Presson left Hi–Tech to start APS, APS became an approved subcontractor to IBM. In December of 1989, approximately seven months after Presson's departure from Hi–Tech, Hi–Tech received a letter from IBM canceling the bulk of Hi–Tech's service business with IBM. That letter was signed by one of Hi–Tech's major sales contacts at IBM, A.M. Verna, who now works at APS. In the following year, Hi–Tech continued to lose IBM's business, which went to APS. Although IBM claimed to select its suppliers through a low price bidding process, APS managed to obtain inside information that ensured it favored status in this process.

Hi–Tech's third amended counterclaim has a rather storied history. Hi–Tech initially filed a counterclaim against APS on December 22, 1990, three days after removing the action from state court. After amending the counterclaim one month later, Hi–Tech filed a second amended counterclaim on February 19, 1991, adding Gregory Presson and James McDevitt as additional counterclaim defendants. Plaintiff moved to strike the second amended counterclaim on the ground that it was filed without the leave of court. On April 15, 1991, I dismissed defendant's first and second amended counterclaims, without disturbing defendant's right to petition for leave to file a third amended counterclaim. One month later, Hi–Tech petitioned for leave to file a third amended counterclaim that was substantially identical to its second amended counterclaim. Subsequently, APS was given leave to amend its complaint; therefore, Hi–Tech no longer needed permission to amend its counterclaim— amendment becoming a matter of right in light of plaintiff's revised complaint—and, on January 30, 1992, I dismissed Hi–Tech's motion for leave to file a third amended counterclaim as moot. Hi–Tech's third amended counterclaim having superseded its second amended counterclaim, plaintiff's motion to dismiss the second amended counterclaim, filed on November 19, 1991, was essentially turned into a motion to dismiss the third amended counterclaim. This motion to dismiss the third amended counterclaim is presently under consideration.

The third amended counterclaim ("the counterclaim") contains various allegations of appropriation of trade secrets, conversion, conspiracy, and tortious interference with business relations, as well as violations of Section one of the Sherman Act. I will examine these eight counts in turn.

## II. The Motion to Dismiss

### A. Misappropriation of Trade Secrets

■ The counterclaim alleges that Presson and McDevitt appropriated trade secrets both by taking a computer program and data containing information about defendant's customers and by inducing Hi–Tech employees to leave that company and join APS. Plaintiff argues that the count is deficient in two ways. First, it contends that the counterclaim fails to state how this property wrongfully came into APS's possession. Second, it claims that, as against Presson and McDevitt, the claim is barred by the statute of limitations.

Insofar as plaintiff objects to Count I's failure to document the circumstances under which the information ended up in the possession of APS, plaintiff demands a degree of specificity in pleading that Federal Rule of Civil Procedure 8 abjures when it calls only for a "short and plain statement of the claim." *See* 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 321–22 (1990) ("Rule 8 indicates that a complaint need only set out a generalized statement of facts from which defendant will be able to frame a responsive pleading.")

■■ To state a claim under the tort of misappropriation of trade secrets in Pennsylvania, the complaint must allege (1) disclosure or use of a trade secret that was "discovered by improper means" *or* (2) disclosure or use that "constitutes a breach of confidence". *Den–Tal–Ez, Inc. v. Siemens Capital Corp.*, 389 Pa.Super. 219, 566 A.2d 1214, 1228–29 (1989). APS contends that Presson and McDevitt had legitimate access to the computer program and data by virtue of their employment with Hi–Tech

and therefore, presumably, did not improperly discover it. Regardless, that access would not entitle them to take the program or data with them when they left to form APS. An employee in whom confidence is reposed has an obligation to maintain the confidentiality of his employer's trade secrets and may not appropriate them for his own benefit. *See Wexler v. Greenberg,* 399 Pa. 569, 160 A.2d 430 (1960); *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838, 842 (1957). By the same token, defendant sufficiently pleads APS's wrongful use of a trade secret by alleging that APS accepted and used information that it knew had been taken from Hi–Tech in violation of confidence. *See Rohm and Haas Co. v. Adco Chemical Co.,* 689 F.2d 424, 429–30 (3d Cir.1982).

■ Also unpersuasive is APS's contention that the claim of misappropriation of trade secrets is barred by the applicable

two year statute of limitations with respect to Presson and McDevitt. *See* 42 Pa.Cons. Stat.Ann. § 5524 (1987). The parties apparently agree that the alleged misappropriation occurred in April, 1989. Presson and McDevitt were named in an amended counterclaim filed February 19, 1991, within the statutory period. However, that amended counterclaim was dismissed, and a motion for leave to amend the counterclaim and the proper amended counterclaim were not filed until May 16, 1991, approximately one month after the close of the statutory period.[2] The question, then, is whether the May 16th motion "relates back" to the timely, original counterclaim and thereby falls within the statute of limitations.[3]

■ The amended counterclaim seeks to join additional parties as counterclaim defendants; therefore, the appropriate starting point is Fed.R.Civ.P. 15(c),[4] which sets

2. The statute of limitations is tolled as soon as a motion for leave to file an amended complaint is filed, rather than on the date of final approval of that motion. *See Longo v. Pennsylvania Elec. Co.,* 618 F.Supp. 87, 89 (W.D.Pa.1985).

3. Because I decide that the amended counterclaim relates back to the original pleading, I need not determine whether the second amended counterclaim, filed within the statutory period, itself tolled the statute of limitations, despite being improperly filed. There is, however, a strong argument that it did. State law supplies the rule of decision for determining when an action is commenced for purposes of the state's statute of limitations. *Walker v. Armco Steel Corp.,* 446 U.S. 740, 752–53, 100 S.Ct. 1978, 1986, 64 L.Ed.2d 659 (1980). Under Pennsylvania law, an action may be commenced by filing a complaint, Pa.R.Civ.P. 1007(2), which here was done within the statutory period. While the filing process was defective, the Pennsylvania courts have repeatedly emphasized that once a complaint is filed, the central concern is not procedural propriety but the good faith of the plaintiff and the notice received by the defendant. For this reason, the Third Circuit has described Pennsylvania rules for commencement of an action as "relatively liberal." *Patterson v. American Bosch Corp.,* 914 F.2d 384, 387 (3d Cir.1990). For instance, timely filing of a complaint may be sufficient to toll the running of the statute of limitations even in the absence of proper service within the statutory period. *See, e.g., Lamp v. Heyman,* 469 Pa. 465, 366 A.2d 882 (1976) (finding that filing of a praecipe four days before expiration of two year statute of

limitations tolled the statute, where plaintiff failed to deliver the writ to the sheriff for service). Instead of treating defects in process as inevitably fatal, Pennsylvania requires plaintiffs who have initiated an action to make "a good faith effort to effectuate notice of the action." *Farinacci v. Beaver County Industrial Development Authority,* 510 Pa. 589, 511 A.2d 757, 759 (1986). Under this "good faith" effort rule, "the thrust of all inquiry is one of whether a plaintiff engaged in a 'course of conduct' forestalling the legal machinery put in motion by his/her filings." *Leidich v. Franklin,* 394 Pa.Super. 302, 575 A.2d 914, 918 (1990) (citing *Lamp*). Here, there is simply no evidence of such a course of conduct or any bad faith whatsoever on defendant's part. After the second amended counterclaim was found defective, defendant quickly filed for leave to file a new counterclaim.

Moreover, plaintiffs *were* put on notice within the statutory period of the commencement of an action against them, as evidenced by their motion to strike of March 8, 1991. Under Pennsylvania law, the statute of limitations is tolled when plaintiff timely files a complaint and defendant is timely put on notice of the action, *even when the process though which defendant received notice was technically improper. See Leidich,* 575 A.2d at 918 (plaintiff's improper service of summons on defendants by mail was sufficient to toll statute of limitations).

4. Even when dealing with a state law claim, the question whether an amendment relates back is one of federal law. *See Britt v. Arvanitis,* 590 F.2d 57, 60–61 (3d Cir.1978); *Loudenslager v. Teeple,* 466 F.2d 249, 250 (3d Cir.1972).

**1456**

out the conditions for "relating back" with respect to "changing a party".[5] In *Schiavone v. Fortune,* 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986), the Supreme Court spelled out the relevant requirements for changing a party under Rule 15(c) as follows:

(1) The basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that but for a mistake concerning identity, the action would not have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

477 U.S. at 29, 106 S.Ct. at 2384.

Because the amended counterclaim recounts the same events described in the original pleading, and, indeed, essentially differs from the original counterclaim only in its caption, there can be no serious dispute that the first condition is satisfied. Therefore, I turn to the notice requirement, which is the "critical element" in deciding whether an amendment relates back, *Avila v. Immigration and Naturalization Serv.,* 731 F.2d 616, 620 (9th Cir.1984),[6] even in the context of additional parties. *See E.E.O.C. v. Westinghouse Elec. Corp.,* 632 F.Supp. 343, 364 (E.D.Pa.1986), *aff'd in part, vacated in part,* 869 F.2d 696 (3d Cir.1989).

Notice, to be effective under 15(c), need not be formal. Fed.R.Civ.P. 15(c) advisory committee's note (1966); *see Varlack v. SWC Caribbean, Inc.,* 550 F.2d 171 (3d Cir.1977) (restaurant manager received sufficient notice when he admitted that he saw a complaint filed against the restaurant and an "unknown employee"). It may come in a variety of informal forms, any one of which, if effective in removing prejudice to defendant from inclusion of the untimely claim, suffices.

First, notice may be imputed to parties added after the limitations period expired "when the original and added parties are so closely related in business or other activities that it is fair to presume the added parties learned of the institution of the action shortly after it was commenced." *Hernandez Jimenez v. Calero Toledo,* 604 F.2d 99, 101–02 (1st Cir.1979). When a corporate entity is named in a complaint, those who own it or run its day-to-day business are typically deemed to have received constructive notice of the action. *See, e.g., Seber v. Daniels Transfer Co.,* 618 F.Supp. 1311 (W.D.Pa.1985) (sufficient identity of interest between corporation and both its major stock owner and its chief executive officer); *Itel Corp v. Cups Coal Co.,* 707 F.2d 1253 (11th Cir.1983) (97% stock owner on constructive notice of action against defendant corporation). As principals and founders of APS, Presson and McDevitt have sufficient "identity of interest" with APS to have received constructive notice of the action when suit was brought against it.

Secondly, courts in this Circuit have found notice sufficient "where a party who has some reason to expect his potential involvement as a defendant hears of the commencement of litigation through some informal means." *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1141 (E.D.Pa.1990). The initiation of a suit against APS in which Presson and McDevitt were repeatedly mentioned by name and charged with responsibility for misappropriating trade secrets from their former employer clearly gave them reason to be aware of their potential involvement as defendants. Given their close relation to

---

**5.** The word "changing" has been liberally construed to cover amended pleadings that, as this one, add entirely new parties without any substitution. C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1498, at 126 (1990).

**6.** Notice is the linchpin of any rule 15(c) determination because relation back is "intimately connected with the policy of the statute of limitations," Fed.R.Civ.P. 15(c), advisory committee's notes (1966), and the purpose of a statute of limitations is to protect defendants from claims of which they have not received notice within a reasonable time after they accrued. *Sierra Club v. Chevron, Inc.,* 834 F.2d 1517, 1523 (9th Cir.1987).

APS, it is implausible that they did not hear about the commencement of the action against it. Moreover, the timely second amended complaint, naming them as additional counterclaim defendants, gave them explicit notice of Hi–Tech's intention to join them, as evidenced by the filing of a motion to strike the amended pleading one month later. The subsequent dismissal of the second amended counterclaim does not affect the quality of the notice that it conferred upon the principals.

These various forms of notice—taken together or looked at separately—ensure that the principals will not now be prejudiced in maintaining their defense, especially where the motion for leave to amend was filed only a month after the end of the statutory period. Indeed, Presson and McDevitt have never claimed to face any prejudice if the claims against them are included.

The more serious issue is the existence of a "mistake concerning identity". A literal reading of that phrase might suggest that only misnamed or misdescribed parties fall with the ambit of rule 15(c). However, "[i]n view of the history of the application of rule 15(c), the phrase 'a mistake concerning the identity of the proper party' should clearly not be read to limit its usefulness to cases of misnomer." 3 *Moore's Federal Practice* ¶ 15.15[4.–2], at 15–167 n. 15 (1988). To do so would contravene the widely-held understanding that this rule allows, in certain circumstances, the addition of new parties that were never originally named or described. Moreover, a narrow reading of the phrase would wrongly divert attention from the "central element" of notice. The "mistake" condition does not isolate a specific type or form of error in identifying parties, but rather is concerned fundamentally with the new party's awareness that failure to join it was error rather than a deliberate strategy. "Where an amendment seeks to add a new defendant, [the mistake] aspect of 15(c) seems designed to insure that, prior to the expiration of the limitations period, the new defendant knew (or should have known) that his joinder was a distinct possibility." *Taliferro v. Costello*, 467 F.Supp. 33, 36 (E.D.Pa.1979) (finding that plaintiffs' fail-ure to include the City of Philadelphia in a civil rights action, though simply mistaken legal judgment, satisfied the mistake condition). In this sense, the mistake condition, though not subsumed by the notice condition, is "intertwined" with it. 3 *Moore's Federal Practice* ¶ 15.15[4.–2], at 15–169 (1988).

The notice and mistake elements are particularly intertwined when, as here, there is a close relation between the original party and the party to be added. In such a situation, failure to join the connected party is more immediately recognizable as error, and it is easier to establish that the new party should have known that, but for a mistake, she would have been included. Therefore, "[c]ourts have generally held that [the mistake condition] is satisfied when the original party and added party have a close identity of interests." *Sounds Express Int'l, Ltd. v. American Themes and Tapes, Inc.*, 101 F.R.D. 694, 697 (S.D.N.Y.1984).

For all of these reasons, courts have typically resisted a narrow reading of the mistake element and allowed the addition of responsible individual defendants when plaintiff simply made an error in legal judgment or form in suing only the corporation. *See, e.g., Kinnally*, 748 F.Supp. at 1136 (failure to name individual defendants, in addition to the company, in a sex discrimination case constituted "mistake concerning identity"); *Itel*, 707 F.2d at 1258 (failure to join president and owner of corporation in a conspiracy and fraud case). Here, where Presson and McDevitt were closely related to the named party and lead actors in the original pleadings, they should have known that, but for an error in legal judgment by Hi–Tech, they would have been joined in that action. Since all of the *Schiavone* elements are satisfied, the amended counterclaim "relates back" to the time of the original pleading and is not time-barred.

**B. Replevin**

By the second count of the counterclaim, Hi–Tech seeks recovery of all allegedly illegally obtained materials in plaintiff's pos-

session. APS contends that this count, too, is barred by the statute of limitations. That argument must be rejected for the reasons given above. APS also argues that, regardless of the statute of limitations, Hi–Tech has waived its replevin claim by failure to advance the claim until more than two years after the alleged theft. APS cites as support for its position *Hahn v. Andrews*, 370 Pa. 65, 87 A.2d 284 (1952) and *French v. Lewis*, 218 Pa. 141, 67 A. 45 (1907). Those cases, however, stand for the proposition that when a buyer in an open market fails to make payment, the seller must exercise his right to reclaim the goods promptly, or lose that right. The principles applicable in an open transaction between two parties do not readily translate to an alleged surreptitious taking from an employer by a former employee. Despite the delay, defendant has not waived its claim.

## C. Conversion

Plaintiff argues that the counterclaim fails to state the elements of a claim of theft and conversion. Conversion has been defined by the Pennsylvania courts as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Shonberger v. Oswell*, 365 Pa.Super. 481, 530 A.2d 112, 114 (1987). Reading the allegations of the counterclaim in a light most favorable to defendant, as I am required to do for the purpose of this motion, *see Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), defendant has set forth the elements of the tort of conversion.

Plaintiff also objects to the conversion claim in the counterclaim as barred by the statute of limitations. Once again, the statute of limitations does not bar the claim for the aforementioned reasons.

## D. Civil Conspiracy

A civil conspiracy cause of action requires that two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means. *Burnside v.*

*Abbott Laboratories*, 351 Pa.Super. 264, 505 A.2d 973, 980 (1985). APS does not deny that Hi–Tech sufficiently pled concert; rather, it contends that defendant failed to plead any unlawful act or means attributable to APS. To establish an underlying unlawful act in Pennsylvania, plaintiff must prove that the parties came together for the express purpose of committing either a criminal act or an intentional tort. *Burnside*, 505 A.2d at 981. Defendant clearly alleged APS's participation in various intentional torts, including the misappropriation of trade secrets and raiding of Hi–Tech's workforce. Therefore, defendant states a civil conspiracy claim.

## E. Tortious Interference with Contractual Business Relations

The elements of tortious interference with contract are:

... (1) that the acts complained of were willful and intentional; (2) that they were calculated to cause damage to the plaintiff and its business; (3) that these were done with the unlawful purpose of causing damage and loss to the plaintiff without right or justifiable cause on the part of the defendant; (4) that actual damage and loss resulted.

*Boyce v. Smith–Edwards–Dunlap Co.*, 398 Pa.Super. 345, 362, 580 A.2d 1382, 1390 (1990). The amended counterclaim alleges a host of acts that a jury could reasonably infer were willful and calculated to cause damage to Hi–Tech's existing business relations, including a conspiracy to defame Hi–Tech in the marketplace and the misappropriation of trade secrets. Moreover, defendant alleges a substantial loss of business from IBM. Plaintiff counters that IBM and others simply chose no longer to do business with Hi–Tech. Surely this a factual dispute best left for a motion on the merits or for trial.

## F. Tortious Interference with Prospective Business Relations

Count VI of the amended counterclaim alleges that by taking expertise and trade secrets from Hi–Tech and colluding with IBM, APS has prevented Hi–Tech from establishing new business relations. Pennsylvania follows § 766B of the Re-

statement (Second) of Torts [7] in defining the cause of action for tortious interference with prospective business relations. *See Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174, 177–78 (1974). To state such a claim under Pennsylvania law, the complaint must, at a minimum, allege the following elements:

(1) a prospective contractual relationship between the plaintiff and third parties, (2) a purpose or intent to harm the plaintiff by preventing the relationship from accruing, (3) the absence of privilege or justification on the part of the plaintiff, and (4) the occurrence of actual harm or damage to the plaintiff as a result of the defendant's conduct.

*Cloverleaf Development v. Horizon Financial F.A.*, 347 Pa.Super. 75, 500 A.2d 163, 167 (1985). APS argues that Hi–Tech has failed to show that any prospective business relation was lost as a result of its conduct; therefore, Hi–Tech's claim stands or falls on its allegations of particular lost future business with IBM or other potential customers.

■ Hi–Tech alleges that APS has destroyed its competitive advantage and undermined its ability to attract new customers, while conceding that it is "not aware of the potential customers it has lost ..." Counterclaim ¶ 49. A mere allegation of lost business does not suffice. As I wrote in dismissing an analogous claim made by APS,

[e]ven at the pleading stage, a plaintiff may not rest a claim for tortious interference with prospective contractual relations on a mere hope that additional contracts or customers would have been forthcoming but for defendant's interference. The complaint must allege facts that, if true, would give rise to a reasonable probability that particular anticipated contracts would have been entered into.

*Advanced Power Systems, Inc., v. Hi–Tech Systems, Inc., et al.*, No. 90–7952, slip. op. at 23, 1992 WL 97826 (E.D.Pa. Apr. 28, 1992) (citations omitted). Just as APS's mere allegations of loss of trade secrets did not give rise to a reasonable probability of loss of future business, so Hi–Tech's claimed loss of competitiveness and unknown customers cannot, standing alone, state a claim for tortious interference with prospective business relations.

On the other hand, by alleging collusion between APS and IBM, Hi–Tech identifies a specific potential business relationship that APS allegedly undermined. Here, it is important to distinguish between two results that Hi–Tech conflates. First, Hi–Tech contends that its allegations concerning the loss of the IBM account state the existence of a prospective contractual relationship disrupted by APS's conduct. If it were true, as Hi–Tech appears to believe, that the cancellation of an *existing* account can provide the basis of a claim of tortious interference with *prospective* relations, there would be little basis for distinguishing between the tort described in Count V and the tort alleged here. *See* Restatement (Second) of Torts § 766B comment (a) ("This Section is concerned only with ... prospective contractual relations, not yet reduced to contract.").

A more plausible claim of lost prospective business relations is defendant's allegation that APS managed to rig IBM's bidding process so that APS obtained additional business with IBM that Hi–Tech might have gotten. The counterclaim states that Hi–Tech was one of a limited number of approved subcontractors eligible to bid for IBM's business; therefore, the averment of a rigged bidding process sufficiently establishes "a reasonable likelihood or probability that an anticipated business arrangement would have been consummat-

---

7. Restatement (Second) of Torts, section 766B, defines the tort of tortious interference with prospective business relations as follows:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

ed" absent APS's interference. *Clover-leaf*, 500 A.2d at 167.

## G. Piracy

In Count VII of the counterclaim, Hi–Tech charges APS with "piracy" of Hi–Tech's employees. APS contends that there is no piracy cause of action in Pennsylvania and, even so, that there is no factual basis for allegations that APS wrongfully induced employee to leave Hi–Tech. While there may be no tort in Pennsylvania named "piracy", it is well settled that to survive a motion to dismiss, the pleading need not correctly categorize legal theories giving rise to the claims, and the court is under a duty to examine the pleadings to determine if the allegations provide for relief under any theory. 5A C. Wright & A. Miller, *Federal Practice and Procedure*, § 1357, at 337 (1990). Pennsylvania recognizes the tort of interference with contractual relations between an employer and his employees. Accordingly, in Pennsylvania

> [t]he systematic inducing of employes to leave their present employment and take work with another is unlawful when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employes. So also, when the inducement is made for the purpose of having the employes commit wrongs, such as disclosing their former employer's trade secret or enticing away his customers, the injured employer is entitled to protection

*Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 847 (1957). Pennsylvania has adopted the Restatement (Second) of Torts §§ 766–768 as a framework for analyzing such claims. *See Franklin Music v. American Broadcasting Companies, Inc.*, 616 F.2d 528, 542–43 (3d Cir.1979). Hi–Tech has sufficiently pled that APS's hiring of its employees was willfully calculated to cause damage to its business.

## H. Sherman Act

The amended counterclaim charges that APS's actions as set forth in the amended counterclaim violated the Sherman Act, 15 U.S.C. § 1. APS argues that the amended counterclaim fails to state a claim under § 1 of the Sherman Act, because (1) the complaint does not allege concerted action and (2) the complaint fails to allege anticompetitive effects. As to the first contention, Hi–Tech counters that it alleged concerted action between APS and IBM in shifting a major IBM service account from Hi–Tech to APS and in rigging IBM's bidding process. Hi–Tech is plainly correct.

The question whether Hi–Tech was required to plead anticompetitive effects is considerably more difficult. Acts that are very likely to interfere with competition are illegal *per se* and require no proof of anticompetitive effects to constitute a Sherman Act violation. *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). No such proof is required because the potential for harm inherent in these practices is so clear and so great. *Bhan v. Nme Hospitals*, 929 F.2d 1404, 1410 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991).[8] In the absence of allegations of acts that violate the Sherman Act *per se*, failure to sufficiently allege anticompetitive effects in a Sherman Act complaint is "fatal to the existence of a cause of action." *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir.1980). Specifically, plaintiff must allege the existence of "adverse, anti-competitive effects within relevant product and geographic markets" to state a cause of action under the rule-of-reason approach. *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). Such a showing is necessary because "[a]n antitrust policy divorced from market considerations would lack any objective benchmarks." *Conti-*

---

**8.** Examples of practices that are illegal *per se* include horizontal price fixing, division of markets, and certain tying arrangements and boycotts. *Bhan*, 929 F.2d at 1410.

*nental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 53 n. 21, 97 S.Ct. 2549, 2559 n. 21, 53 L.Ed.2d 568 (1977). Additionally, to ensure that the Sherman Act does not interfere with practices that do not unreasonably restrain competition, there is a presumption in favor of a rule-of-reason standard. *Business Electronics v. Sharp Electronics,* 485 U.S. 717, 726, 108 S.Ct. 1515, 1520, 99 L.Ed.2d 808 (1988).

Hi–Tech argues that it need not prove anticompetitive effects because it alleged a conspiracy to commit unfair competitive acts designed to destroy Hi–Tech's business. According to Hi–Tech such acts constitute a *per se* violation of the Sherman Act.

Hi–Tech essentially attempts to turn a civil conspiracy claim into a *per se* Sherman Act violation. In doing so, it has some support. Hi–Tech relies on *Albert Sauter Co. v. Richard Sauter Co.,* 368 F.Supp. 501 (E.D.Pa.1973) and *Erie Technological Products, Inc. v. Centre Engineering, Inc.,* 52 F.R.D. 524 (M.D.Pa.1971). These cases held that the Sherman Act is violated wherever there is proof of a conspiracy to engage in acts of unfair competition designed to eliminate the plaintiff as a competitor. In *Sauter,* two former employees of plaintiff were found to have conspired to leave plaintiff and eliminate it as a competitor by appropriating its key personnel, confidential information, customer lists, and reputation. Similarly, in *Erie Technological,* plaintiff's Sherman Act claim centered on defendants' alleged conspiracy to eliminate plaintiff from competition by enticing away its employees and trade secrets.

■ Hi–Tech alleges a similar scenario of appropriation of trade secrets and employees by APS. Oddly, however, Hi–Tech apparently bases its Sherman Act claim on a conspiracy between APS *and IBM*, by referring mostly to the collusion with IBM in the relevant portions of its counterclaim

and its brief opposing the Motion to Dismiss. The counterclaim provides no indication that the alleged theft of secrets and employees from Hi–Tech could conceivably be part of the agreements between APS and IBM. Therefore, for purposes of its Sherman Act counterclaim, Hi–Tech does not allege a *Sauter*-style conspiracy among the counterclaim defendants [9] and/or with other former employees of Hi–Tech. Rather, the counterclaim alleges an agreement between a single, competing supplier and a single customer to deprive the defendant of that customer's business. Regardless of whether such an agreement is an actionable wrong under state tort law, it surely differs from a conspiracy between a new competitor and the employees of the competing firm to drive the old firm completely out of business. Horizontal competitors have facially obvious incentives to injure one another; however, it is less manifest that a customer in IBM's position has a motive to undermine the business of one of its suppliers. Indeed, the type of anticompetitive intent on which a Sherman Act § 1 claim can be founded is more difficult to establish than the intent to injure a party which supports a tort recovery. *See Franklin Music v. American Broadcasting Companies,* 616 F.2d 528, 556 (3d Cir. 1979) (Sloviter, J., concurring). Agreements are *per se* illegal under the Sherman Act only when their nature is "so plainly anticompetitive that no further study of the industry is needed to establish their illegality …" *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). Agreements between a customer and a supplier are less inherently suspect than agreements between a competitor and the employees of its competition.

Similarly, the economic impact of one customer switching suppliers is less certain than a concerted effort on the part of a competitor's employees or former employ-

---

9. While normally § 1 does not reach a putative "conspiracy" between a corporation and its employees, *Tose v. First Pennsylvania Bank,* 648 F.2d 879, 893–94 (3d Cir.1981), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), it is possible that in special circumstances a corporation incorporated pursuant to a conspiracy *may* be, from its inception, a member of the conspiracy. *Sauter,* 368 F.Supp. at 510.

ees to drive it out of business, and the Court has noted its reluctance "to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986). *Per se* rules are appropriate only for conduct " 'that would always or almost always tend to restrict competition and decrease output.' " *Business Electronics*, 485 U.S. at 723, 108 S.Ct. at 1519 (citations omitted). The redirection of IBM's business does not have the obvious anticompetitive effects expected of a *per se* Sherman Act violation.

Moreover, *Sauter* is not, at least for the proposition that Hi–Tech intends to draw from it, the law of this Circuit.[10] In *Franklin Music v. American Broadcasting Companies*, 616 F.2d 528 (3d Cir.1979), the jury found that there was a civil conspiracy to injure the plaintiff. In reviewing the verdict, the trial court decided that the intentional commission of the state tort of conspiracy did not constitute a *per se* violation of the Sherman Act and applied a rule-of-reason test. Although the record showed that plaintiff had ultimately been driven out of business, the trial court concluded that plaintiff had failed to introduce evidence of any impact on its competition with others and directed a verdict on plaintiff's Sherman Act claim in favor of the defendants. Plaintiff argued that the conspiracy verdict was sufficient to send the antitrust claim to the jury, but the Third Circuit disagreed. In affirming the directed verdict, the court held that "a civil conspiracy for a purpose unlawful under Pennsylvania law *must be accompanied by proof of an effect upon competition in a defined market* in order to make out a prima facie violation of section 1 of the Sherman Act." 616 F.2d at 528 (emphasis added). Therefore, under the law of the Third Circuit, plaintiff must show an anticompetitive effect beyond injury to their particular business. *See Chronister v. Atlantic Richfield Co.*, 653 F.Supp. 1576, 1581 (M.D.Pa.1987). "[A]dverse impact [on competitive conditions] is simply not shown by a loss of profits or even by the total elimination of one competitor." *Northeast Women's Center, Inc. v. McMonagle*, 670 F.Supp. 1300, 1305 (E.D.Pa.1987). The requirement of demonstrating that a conspiracy to harm actually created a public injury to competition is consistent with the view of the Supreme Court that the antitrust laws "do not purport to afford remedies for all torts committed by or against persons in interstate commerce." *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945). As the Court has repeatedly emphasized, these laws were enacted for "the protection of *competition* not *competitors.*" *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (emphases in original).

In a concurring opinion, Judge Sloviter harmonized the *Franklin Music* result with the *Sauter* line of cases by noting that—despite confused language to the contrary—these cases did not actually adopt a *per se* approach to conspiracies to impair plaintiff's ability to compete. Rather, according to Judge Sloviter, these cases held that anti-competitive motive satisfied the rule-of-reason test, at a time when, under that test, it was only necessary to show either anticompetitive effects *or* mo-

---

**10.** The *Sauter per se* approach has been repeatedly rejected or questioned by virtually every other court considering the issue. *See, e.g., Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 555–6 (7th Cir.1980) (refusing to adopt a *per se* approach to conspiracy to eliminate a competitor by unfair means); *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83 (5th Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979) (rejecting a *per se* rule approach of *Sauter* ); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 560–61 (1st Cir.1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975) (unfair competitive acts violate Sherman Act only if defendant had significant market power and used unfair means to cripple competitors, thereby affecting competition as required by rule-of-reason); *Southland Reship, Inc v. Flegel*, 401 F.Supp. 339, 346 (N.D.Ga.1975), *aff'd*, 534 F.2d 639 (5th Cir.1976) (holding that *Sauter* and related cases can only be applied in a unique situation—"when the result is to eliminate the effective competitor").

tive. 616 F.2d at 556–57. Judge Sloviter concluded with the following pertinent observations:

There are instances when the goal of the antitrust laws in the preservation of competition is inconsistent with the protection of other interests under state tort law. The *per se* classification would preclude the presentation of market conditions. It might deter formation of new small businesses composed of some former employees of a dominant company who seek to instill competition into a languid market.

616 F.2d at 558.

■■■■■■ Therefore, the question is whether, leaving aside their potential status as state torts and any broad allegations of a conspiracy to injure through anticompetitive acts, the bid rigging allegations independently constitute a *per se* violation of the Sherman Act. As a general matter, the Sherman Act does not require competitive bidding, *National Soc'y of Professional Eng'rs v. U.S.*, 435 U.S. 679, 694–95, 98 S.Ct. 1355, 1366–67, 55 L.Ed.2d 637 (1978), and a buyer can conspire with a new supplier to take the place of its present supplier. *See Northwest Power Products, Inc., v. Omark Industries*, 576 F.2d 83, 86 (5th Cir.1978). Therefore, the particular means of reallocating business must inherently restrain competition. Conspiracies between horizontal competitors to submit collusive, non-competitive bids to a third party are *per se* violations of the Sherman Act. *E.g., United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir.1977); *United States v. Brighton Bldg. & Maintenance Co.*, 598 F.2d 1101, 1106 (7th Cir.1979), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979). There, rigging makes it impossible for the biddee to get a fair, market price. Conversely, agreements to rig bids among persons who are not actual or potential competitors "is meaningless for Sherman Act

purposes" because they have no market impact. *United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir.1986), *cert. denied*, 479 U.S. 819, 107 S.Ct. 82, 93 L.Ed.2d 36 (1986). In this case, no agreement between competitors has been alleged. Rather, Hi–Tech alleges essentially a vertical[11] sham bidding conspiracy between the biddee and one bidder.

■■■■ "[A] vertical restraint is not illegal *per se* unless it includes some agreement on price levels." *Business Electronics*, 485 U.S. at 735–36, 108 S.Ct. at 1525.[12] Absent an agreement on resale price in the broader market—which has not been alleged here—collusion between vertically related parties has no obvious pernicious effect on competition. Accordingly, the Court has refused to apply a *per se* test to a vertical nonprice restraint under which a manufacturer terminated one dealer because of an exclusive territory agreement with another, *see Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), or to an agreement between a manufacturer and a dealer to terminate a "price cutter". *See Business Electronics*, 485 U.S. at 726–28, 108 S.Ct. at 1520–21. In both situations, the Court rejected the *per se* approach because of a necessity to inquire further into the market effects of such arrangements. Here, the mere fact that one prospective supplier may lose business because of vertical dealings between the buyer and another vendor does not itself establish a public injury to competition.

Even so far as the purported bid-rigging agreement between IBM and APS may be alleged to amount to price fixing, de facto price fixing effectuated by sham bidding does not constitute a *per se* Sherman Act violation in this Circuit. In *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440 (3d Cir.1978), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978),

11. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Electronics*, 485 U.S. at 730, 108 S.Ct. at 1522.

12. In *Business Electronics*, the Court also made clear generally that *"per se* illegality should be narrow in the context of vertical restraints." 485 U.S. at 724, 108 S.Ct. at 1519.

defendant owned a manufacturing facility that it decided to sell. Defendant's agent solicited a bid from plaintiffs and approximately fifty others. After plaintiffs' bid was rejected, they sued, alleging that one bidder had been previously selected to obtain the contract if it would match the highest bid submitted. The Third Circuit affirmed a judgment notwithstanding the verdict in favor of defendant on the antitrust claim. In doing so, the court concluded:

> The mere existence of sham bidding ... in our view does not create a presumptive violation of the Sherman Act. We do not find it so anticompetitive that the court routinely should allow a party to invoke the per se rule and thereby avoid the need to show its affect on commerce in each case.

575 F.2d at 447. In response to plaintiffs' claim that the bid rigging amounted to price fixing, the court explained, "[t]he price fixing within the scope of the *per se* prohibition of § 1 ... is an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves." *Id.* at 446. Further, the court observed that it was aware of no case in which a court has found a *per se* violation "on the basis of a concerted refusal to deal between a single seller and a single buyer." *Id.* at 447.

Therefore, because Hi–Tech has not alleged that the vertical agreements between IBM and APS restricted competition in the relevant market, it has failed to state a claim under the Sherman Act. Accordingly, Count VIII of the counterclaim is dismissed.

### III. Conclusion

For the reasons discussed above, Advanced Power System's motion to dismiss the counterclaim will be granted in part and denied in part.